IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> SHAWN LEON ANDERSON, <br><br> Defendant. | CR 24-38-BLG-SPW <br><br><br> ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS |

Before the Court is Defendant Shawn Leon Anderson's Motion to Suppress. (Doc. 33). Anderson seeks to suppress all evidence obtained during a search of a motel room, asserting that the evidence was obtained in violation of the Fourth Amendment. (Docs. 34, 38). The Government opposes the Motion. (Docs. 36, 41).

The Court held a hearing on April 10, 2026, at which Montana Division of Criminal Investigation ("DCI") Agent Adam Miller ("Agent Miller") testified. The Court finds no material facts in dispute based on the parties' briefing, the witness's testimony, and related exhibits.

I.    Background

The Superseding Indictment charges Anderson with one count of Conspiracy to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846, and one count of Possession with Intent to Distribute Controlled Substances,

1

in violation of 21 U.S.C. § 841(a)(1). (Doc. 25 at 2–3).

The charges arise from law enforcement's search of a motel room at the Rodeway Inn in Billings, Montana, on July 21, 2023. (Doc. 34-1 at 1). At that time, Anderson was on probation with Montana Department of Corrections and subject to the standard conditions of probation, including the condition that probation officers may search his "person, vehicle, and/or residence" upon reasonable suspicion. (Doc. 36-2 at 1).

Before the search, on July 6, 2023, Agent Miller and Montana Highway Patrol ("MHP") Interdiction Trooper John Metcalfe ("Trooper Metcalfe") stopped a vehicle in Billings because the rear license plate did not match the vehicle's registration. (Doc. 37-1 at 1). During the traffic stop, Trooper Metcalfe conducted a search of the driver's person, yielding the discovery of fentanyl pills, methamphetamine, and a glass pipe. (*Id.*). The driver—the source of information ("SOI") in this case—was advised of his rights and agreed to speak with Agent Miller about the drugs. (*Id.*). The SOI told Agent Miller that he obtained the fentanyl pills from "Shawn Anderson" on a front earlier that day. (*Id.*). The SOI planned to sell the pills and then pay Anderson for them, keeping a profit for himself. (*Id.*). The SOI ultimately expressed interest in cooperating with law enforcement and provided information against his own self-interest. (*Id.* at 2). The SOI was released at the scene with no criminal charges. (*Id.*).

Thereafter, on July 21, 2023—the day of the search—the SOI informed Agent Miller that Anderson was "getting a room" at the Rodeway Inn on North 27th Street in Billings. (Doc. 34-2 at 1). Agent Miller drove to that location in his unmarked vehicle around 2:25 p.m. to survey the scene while the SOI provided him with periodic updates. (*Id.*). At Agent Miller's direction, the SOI contacted Anderson to set up a drug deal. (*Id.*). Anderson coordinated with the SOI to pick him up by vehicle, but Agent Miller instructed the SOI to obtain Anderson's motel room number instead, so the SOI could stop by later. (*Id.*). The SOI informed Agent Miller that Anderson was staying in Room 218. (*Id.*).

Around 2:45 p.m., Agent Miller saw Anderson and an unidentified woman enter Room 118, not 218. (*Id.*). They each carried backpacks into the room, and a few minutes later, they exited the room and walked to a blue Dodge Ram pickup truck. (*Id.* at 2). Only the woman carried a backpack. (*Id.*). Anderson retrieved a motorcycle helmet from the driver's side of the truck and returned to the motel room while the woman drove away in the truck. (*Id.*). Agent Miller followed the truck for a few blocks, coordinated with MHP to conduct a traffic stop, and then returned to a parking lot across from the Rodeway Inn, where he had a direct view of Room 118's doorway. (*Id.*).

Prior to the day of the search, Agent Miller testified that he had been informed of Anderson's probation status by a Montana Department of Corrections Probation

3

and Parole ("Probation and Parole") officer. As such, he contacted Probation and Parole Supervisor Micky Eckhart ("Officer Eckhart") to advise him of Anderson's recent activities at the motel. (*Id.*). Probation and Parole was in the initial steps of issuing a warrant for Anderson's arrest since he had been avoiding contact at his listed residence on Bench Boulevard. (*Id.*). Anderson had also been out of contact with his probation officer for 23 days. (Doc. 34-1 at 1). Officer Eckhart told Agent Miller that "he would authorize a search of Anderson if he was located." (Doc. 34-2 at 2).

Officer Eckhart and Probation and Parole Officer Tom Fulton ("Officer Fulton") drove to Agent Miller's location, where he told them he believed Anderson was alone in the room. (*Id.*). After additional DCI agents arrived at the scene, Agent Miller testified that the officers went to the front desk and inquired about a key to Room 118. The front desk clerk refused the officers, telling them to come back with a warrant.

Officers Eckhart and Fulton, joined by Agent Miller and the additional DCI personnel, then approached Room 118, knocked on the door, and identified themselves as Probation and Parole. (*Id.*). Anderson opened the drapes of the window, looked out at the officers, shut the drapes, and then remained inside the room without opening the door. (Doc. 34-1 at 1).

A hotel staff member standing nearby offered the officers a master key to the

room, which they accepted and used to open the door. (*Id.*; Doc. 34-2 at 3). According to Agent Miller's testimony, he was concerned that the longer they waited outside, the more likely it was that Anderson would flush drugs down the toilet. Once inside the room, Anderson exited the bathroom with his hands up. (Doc. 34-1 at 1). He told the officers that the "stuff they were looking for was in the backpack under the sink." (*Id.*).

Anderson was detained, handcuffed, and searched by Officers Eckhart and Fulton. (Doc. 34-2 at 3). After securing the room, the officers searched through the backpack and a hollowed-out Arizona Iced Tea can they discovered in the bathroom. (*Id.*). They found methamphetamine, fentanyl, cocaine, cash, a digital scale, drug paraphernalia, and used and unused plastic baggies. (*Id.* at 4; Doc. 36-1 at 8–16). The room was otherwise undisturbed. Agent Miller testified that the beds were still made and that there were no observable signs of significant use within the room. He found no other evidence of personal luggage, effects, or toiletries in the room.

While the room was searched, Agent Miller conducted a Mirandized interview of Anderson. (Doc. 34-2 at 3). Anderson "admitted that he got the hotel room . . . to sell all the 'shit'" and to draw attention away from "his residence off [of] Bench Boulevard." (*Id.*). He also told Agent Miller that he had "just checked in at the hotel . . . but was planning on staying there multiple nights." (*Id.* at 5). He further admitted that he had his female companion, Amber Stewart, rent the room in her name to

5

avoid detection by Probation and Parole. (*Id.*).

In addition to the search of the room, Agent Miller participated in the subsequent search of Stewart's backpack and the truck after effectuating a warrant. (*Id.* at 5). The search yielded loose fentanyl pills, cocaine, suspected methamphetamine, a digital scale, and Stewart's cell phone. (*Id.*). Agent Miller testified that he also found some personal effects in her backpack, including makeup, combs, and various personal hygiene products. There was otherwise no evidence of overnight luggage.

## II.   Legal Standard

A defendant may challenge the admissibility of evidence prior to trial under Federal Rule of Criminal Procedure 12(b)(3)(C), which governs motions to suppress evidence. The foundation for such challenges lies in the Fourth Amendment, which guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

"In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, [the U.S. Supreme] Court . . . conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968) (citing *Weeks v. United States*, 232 U.S. 383 (1914)).

6

When law enforcement violates a defendant's Fourth Amendment rights, the exclusionary rule mandates that "all evidence seized as a result of the [violation] must be suppressed as the fruit of the poisonous tree." *United States v. Morales*, 252 F.3d 1070, 1073 (9th Cir. 2001). A defendant has the ultimate burden of proof on a Fourth Amendment motion to suppress. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

## III.    Discussion

In his opening brief, Anderson claims that because law enforcement did not have probable cause to believe Room 118 was his residence, they were not authorized to perform a probation search, and thus, the warrantless search was unlawful under the Fourth Amendment. (Doc. 34 at 6–15). He further argues that Officer Eckhart "unlawfully functioned as a 'stalking horse' to evade the warrant requirement." (*Id.* at 15–17).

Regardless of whether a probation search occurred, the Government contends that Anderson did not retain a legitimate expectation of privacy in the motel room, placing any search beyond the reach of Fourth Amendment protection. (Doc. 36 at 10). Anderson disputes the Government's analysis, urging the Court to find that the search fell squarely within the Fourth Amendment's purview because he had a property interest and a reasonable expectation of privacy in Room 118. (Doc. 38 at 3–9). The Government disagrees, but argues that if either of Anderson's theories

prevails, the officers' intrusion was lawful under the exigent circumstances exception to the warrant requirement. (Doc. 36 at 13–17; Doc. 41 at 2–8, 13–17).

Here, the Court is persuaded by the Government's position that the officers' entrance into the room did not violate Anderson's Fourth Amendment rights. The Court further concludes that the subsequent search of Anderson's person and backpack were lawful pursuant to his probation conditions and consent.

### A.   The Officers' Warrantless Entrance into Room 118

As an initial matter, the Court concludes that the officers' warrantless entrance into Room 118 exceeded the permissible bounds of the probation-search exception to the Fourth Amendment because the officers did not have probable cause to believe that Room 118 was Anderson's residence. Anderson correctly argues that while probationers do not enjoy the same "absolute liberty" under the Fourth Amendment as law-abiding citizens, *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987), law enforcement must have probable cause to believe that the probationer is a resident of the place to be searched, *United States v. Franklin*, 603 F.3d 652, 656 (9th Cir. 2010). A motel room may qualify as a probationer's residence; however, a residence is generally the place that the probationer would reasonably understand as the location he lives at the time of the search. *United States v. Cervantes*, 859 F.3d 1175, 1182 (9th Cir. 2017) (explaining that a probationer would not understand the term "residence" to include a place where he is an overnight guest); *see, e.g., Franklin,*

8

603 F.3d at 657 (a motel room qualified as probationer's residence because he rented it in his name, was entitled to control and access to the room, and was otherwise homeless). Establishing residence "requires more than a sleepover at someone else's place," and "[it] is insufficient to show that the [probationer] may have spent the night there occasionally." *Franklin*, 603 F.3d at 656–57 (quoting *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006), *overruled in part on other grounds by*, *United States v. King*, 687 F.3d 1189 (9th Cir. 2012)).

Here, the record shows that the officers did not have probable cause to believe that Anderson's residence was Room 118. His listed address was known to Probation and Parole, Agent Miller, and later confirmed by Anderson as 1142 Bench Boulevard. (Doc. 34-2 at 3). On the day of the search, the SOI told Agent Miller that Anderson was "getting a room," indicating that Anderson had only just checked in. Agent Miller observed Anderson at the motel for a little over an hour before initiating the search. In short, the officers did not have enough information to establish that Anderson was anything more than a potential guest at the motel. Accordingly, because Anderson's probation search condition was limited to his "person, vehicle, and/or residence" (Doc. 36-2 at 1), and the officers did not have probable cause to establish that Room 118 was his residence, their entrance into the

room cannot be justified as a probation search.[1]

For this reason, the success of Anderson's Motion turns on whether the officers' warrantless entry into Room 118 invaded his personal Fourth Amendment rights. In weighing the facts of this case, the Court ultimately concludes that Anderson does meet his burden under the Fourth Amendment, as he lacked both a reasonable expectation of privacy and a property interest in the room.

A Fourth Amendment search is triggered in two circumstances. *United States v. Esqueda*, 88 F.4th 818, 823 (9th Cir. 2023). Under the *Katz* test, a "search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing *Katz v. United States*, 389 U.S. 347, 361 (1967)). Under the unlicensed physical intrusion test, a search occurs when the government "physically occupie[s] private property for the purpose of obtaining information," *United States v. Jones*, 565 U.S. 400, 404 (2012), "to engage in conduct not explicitly or implicitly permitted" by the property holder. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). "Each test is independently sufficient to determine whether government conduct amounts to a Fourth Amendment search: a search occurs if police conduct satisfies either the *Katz*

---

[1] Because the officers' entrance into the room cannot be justified as a probation search, Anderson's "stalking horse" argument is not applicable under the circumstances of the case. (*See* Doc. 34 at 15–17).

10

test or the unlicensed physical intrusion test, even if that conduct does not amount to a search under the other test." *Esqueda*, 88 F.4th at 823.

### 1. The Katz Test

To claim Fourth Amendment protection under *Katz*, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). The burden is on the defendant to "establish[] that, under the totality of the circumstances, the search or the seizure violated their legitimate expectation of privacy." *United States v. Silva*, 247 F.3d 1051, 1055 (9th Cir. 2001).

Although the text of the Fourth Amendment permits individuals to claim protections in "their . . . houses," the U.S. Supreme Court has held that a person's expectation of privacy extends to hotel or motel rooms. U.S. Const. amend. IV; *Stoner v. California*, 376 U.S. 483, 490 (1964); *United States v. Cormier*, 220 F.3d 1103, 1108–09 (9th Cir. 2000). This protection may also apply to co-occupants who stay overnight and keep their belongings in another's room. *See, e.g., Jones v. United States*, 362 U.S. 257 (1990) (The defendant maintained a reasonable expectation of privacy in his friend's apartment because he was an overnight guest, stored clothing there, and was the sole occupant at the time of the search.); *Minnesota v. Olson*, 495 U.S. 91 (1990) (affirming that defendant's status as an overnight guest gave him a legitimate expectation of privacy in the home).

However, a person who is "mere[ly] presen[t]" in another's motel room, or home, may not necessarily claim the same protections. *United States v. Grandstaff*, 813 F.2d 1353, 1357 (9th Cir. 1987); *Carter*, 525 U.S. at 91 (A person who is "merely present with the consent of the householder may not" claim a Fourth Amendment defense.). In *Grandstaff*, for example, the court found that co-defendant Brown did not have a reasonable expectation of privacy in a hotel room because he did not show that he shared the room with Grandstaff, stayed there overnight, or kept his luggage there. 813 F.2d at 1357.

Likewise, a guest's reasonable expectation of privacy is significantly diminished when that individual uses the premises solely to engage in narcotics activity. *Carter*, 525 U.S. at 89–91. In *Carter*, a police officer observed the defendants through a window while they bagged cocaine in an apartment. *Id.* at 85. One defendant sought to suppress the evidence, arguing that the officer's observation constituted an unreasonable search. *Id.* at 86. The Court held that the defendants, who were in the apartment for a short time solely for the purpose of packaging cocaine, had no legitimate expectation of privacy in the apartment and therefore, any search that might have occurred did not violate their Fourth Amendment rights. *Id.* at 89–90. The Court also highlighted that property used for commercial purposes is treated differently under the Fourth Amendment than residential property, with a lesser expectation of privacy. *Id.* at 90–91. Because the defendants were present for

12

a commercial transaction and had no previous connection with the apartment's lessee, their situation was "closer to that of [some]one simply permitted on the premises." *Id.* at 91.

Here, the facts seemingly cut both ways. In one respect, Anderson shows his legitimate expectation of privacy in the room: he paid for the room, possessed a key, and planned to stay multiple nights. (Doc. 38 at 6). However, considering the full factual context, the Court finds the evidence more convincingly shows that Anderson lacked a legitimate expectation of privacy in Room 118.

First, like in *Grandstaff*, Anderson does not demonstrate that he was anything more than "merely present" in the room when the officers arrived. Although he possessed a key card and stated he planned to stay for multiple nights, there was no firm evidence that he was in fact an overnight guest. Stewart was the only registered occupant on record because the reservation was in her name. Moreover, the officers did not find luggage, toiletries, or additional personal belongings that might have confirmed Anderson's stated intention to stay multiple nights or his status as Stewart's co-occupant.

Second, like *Carter*, Anderson's relatively short time on the premises combined with the commercial nature of the activity he planned to engage in with the SOI leads the Court to conclude that he had no connection to Stewart or the premises other than one which allowed him to use the room to sell drugs. Anderson

13

admitted to Agent Miller that "he got the hotel . . . to sell all the 'shit'. . . so he [would] not get attention doing it out of his residence." (Doc. 34-2 at 5). Despite his key-card access to the room or his statement that he planned to stay multiple nights, Anderson has not provided sufficient evidence to determine that he was anything but "simply permitted on the premises" for the purely commercial activity of selling drugs. *See Carter*, 525 U.S. at 91.

Although the facts present a close question, they ultimately support the conclusion that Anderson did not have a legitimate expectation of privacy in Room 118 and therefore, he cannot establish that a search occurred under the *Katz* test.

### 2.    The Unlicensed Physical Intrusion Test

The unlicensed physical intrusion test is a property-based test meant to protect those areas and items enumerated by the Fourth Amendment's text—an individual's "person[], house[], papers, and effects." U.S. Const. amend. IV; *Jones*, 565 U.S. at 405–11; *Jardines*, 569 U.S. at 6, 11. In other words, "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a search within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Jardines*, 569 U.S. at 5 (quoting *Jones*, 565 U.S. at 406 n.3).

Although a motel room is not enumerated in the Fourth Amendment's text, the Ninth Circuit has generally held that a "motel room is a constitutionally protected area that is entitled to Fourth Amendment protections." *Esqueda*, 88 F.4th at 823

14

(citing *Stoner*, 376 U.S. at 490). At the same time, the Ninth Circuit has held that a search under the physical intrusion test occurs only "when the government physically occupie[s] private property for the purpose of obtaining information to engage in conduct not explicitly or implicitly permitted by the *property owner*." *Id.* (alteration in original) (emphasis added) (citations and internal quotation marks omitted). Indeed, a defendant seeking suppression must show that his "*own* Fourth Amendment rights [were] infringed by the search . . . which he seeks to challenge." *Byrd v. United States*, 584 U.S. 395, 403 (2018) (emphasis added) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133 (1978)). Thus, under the unlicensed physical intrusion test, a defendant may only "object to . . . 'constitutionally protected area[s]' in which he has a *property interest*." *United States v. Beaudion*, 979 F.3d 1092, 1097 (5th Cir. 2020) (emphasis added) (quoting *Jones*, 565 U.S. at 407).

The Ninth Circuit applied this principle in *Chong v. United States*, 112 F.4th 848 (9th Cir. 2024). That case involved petitioners Harson Chong and Tac Tran, who filed post-conviction motions alleging ineffective assistance of counsel due to their counsel's failure to object to a search of Chong's residence on Fourth Amendment grounds. *Id.* at 852. Law enforcement's search of Chong's residence led to the discovery of drugs, guns, and money. *Id.* at 853. The central issue was whether the officer was standing within the curtilage of Chong's home and why he entered that part of the property. The Ninth Circuit determined that the officer was

15

standing within the curtilage, which constituted a physical trespass and violated Chong's Fourth Amendment rights. *Id.* at 858. The search was deemed unreasonable as it lacked a warrant, consent, or exigency. *Id.* Consequently, Chong's counsel was found ineffective for not moving to suppress the evidence premised on this clear winning argument. *Id.* at 862. Tran, however, lacked standing to challenge the search, as he did not have a property interest or a legitimate expectation of privacy in Chong's home, and thus, his counsel's performance was not deemed ineffective. *Id.* at 862–63. According to the court, Tran had no property interest in the home because he did not own it, did not pay rent, and although he opened the door without Chong letting him in, he did not possess a key. *Id.* at 862. Therefore, Tran could not challenge the illegal search under the physical intrusion test.

Here, again, the facts seemingly cut both ways. In one respect, Anderson established a property interest by paying for the room, possessing key-card access, and intending to stay multiple nights. However, the circumstances taken together lead the Court to conclude that Anderson lacked a possessory interest in the room.

First, Anderson was an unregistered guest without overnight luggage or personal belongings. Second, by arranging the room rental as a location to sell drugs away from his residence, he markedly diminished any property interest he might otherwise claim. Renting a motel room within five miles of a residence strongly

16

suggests an intent to avoid detection rather than a legitimate lodging need. Finally, Anderson lacked physical evidence supporting his intent to stay multiple nights—namely, overnight luggage or personal effects belonging to him or Stewart.

Although the facts present a close question, the Court ultimately concludes that Anderson, like Tran—a mere visitor—did not maintain a property interest in Room 118. Therefore, Anderson cannot establish that a search occurred under the unlicensed physical intrusion test.

B.    *The Officers' Search of Anderson's Person and Backpack*

Because Anderson lacked a legitimate expectation of privacy and a property interest in Room 118, any search of the room which may have occurred did not violate his Fourth Amendment rights. The Court additionally finds that once inside the room, the officers had reasonable suspicion to suspect that Anderson was violating his probation conditions and therefore could lawfully search his person and backpack. Further, even if Anderson's backpack was not subject to a probation search, his unsolicited statement that the "stuff they were looking for was in the backpack under the sink" qualified as implied consent. (Doc. 34-1 at 1).

Reasonableness is the touchstone of a Fourth Amendment analysis, and "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United*

17

*States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). Warrantless searches are presumptively unreasonable under the Fourth Amendment unless the search is justified under an established exception to a warrant requirement. *Katz*, 389 U.S. at 357.

Probationers do not enjoy the same "absolute liberty" under the Fourth Amendment to which other law-abiding citizens are entitled. *Id.* (quoting *Griffin*, 483 U.S. at 874). "These restrictions are meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Griffin*, 483 U.S. at 875. Pursuant to these principles, the Fourth Amendment allows law enforcement to search a probationer without a warrant upon reasonable suspicion of a probation violation. *Knights*, 534 U.S. at 121–22.

Here, Anderson does not dispute that the officers had reasonable suspicion to believe he was violating his probation conditions and therefore, the search of his person did not violate his Fourth Amendment rights. Indeed, Probation and Parole was poised to apply for an arrest warrant given that Anderson had been avoiding contact at his residence. Anderson's backpack was also likely subject to the probation search even though it was on the bathroom floor when the officers entered the room. By that time, Agent Miller had seen Anderson with the backpack on his

18

person when he entered the room. Anderson then stood close by the backpack as the officers entered, indicating it plausibly was in Anderson's control.

Nonetheless, even if the backpack was not subject to a probation search, Anderson impliedly consented to the search. Indeed, a search conducted by free and voluntary consent is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Anderson does not specifically dispute this issue and the record shows that he willingly and voluntarily told the officers where the drugs were. Anderson's statement—the "stuff [you are] looking for [is] in the backpack under the sink"—essentially invited the officers to search the backpack where pertinent evidence would be found. *See United States v. Rosi*, 27 F.3d 409, 412–14 (9th Cir. 1994). His statement "clearly indicates that [he] was willingly cooperating with authorities, that [he] offered the information about the [backpack] with the full expectation that the [officers] would search it, and that [he] did not object when they proceeded to do so." *Id.* at 413–14. Under these circumstances, Anderson's Fourth Amendment rights were not violated and the evidence discovered as a result of the search is not subject to suppression.

///

///

///

///

19

## IV.    Conclusion

For the reasons stated herein, IT IS HEREBY ORDERED that Defendant Shawn Leon Anderson's Motion to Suppress (Doc. 33) is DENIED.

DATED this ___4th___ day of May, 2026.

Susan P. Watters
SUSAN P. WATTERS
United States District Judge